## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:10-CR-200-DBH |
| | ) | |
| TREZJUAN THOMPSON, | ) | |
| | ) | |
| DEFENDANT | ) | |

## MEMORANDUM DECISION AND ORDER ON
## MOTION TO WITHDRAW GUILTY PLEA

Before sentencing, the defendant has asked me, through his third court-appointed lawyer, to let him withdraw the guilty plea he made with his first lawyer. I apply the factors that the First Circuit uses for evaluating whether such a motion meets the "fair and just reason" standard of Fed. R. Crim. P. 11(d)(2)(B). I **DENY** the motion and conclude that no evidentiary hearing is necessary.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 9, 2010, the government filed a complaint accusing the defendant Trezjuan Thompson, a convicted felon, of possessing, in and affecting commerce, a firearm. Thompson was arrested on April 2, 2010, and the assistant federal defender (lawyer #1) was appointed to represent him. He has been detained continuously since then. According to a jail record, on the date that Thompson was arrested, he "verbally denies any need for medical[ ],

dental, and or mental health [at] this time." Ex. 1 to Supplement to Def.'s Mot. to Withdraw Guilty Plea at 1 (ECF No. 66-1). An indictment reflecting the same felon-in-possession charge was filed April 28, 2010 under docket number 2:10-cr-74-DBH. In that case, Thompson filed a motion to suppress evidence and, after an evidentiary hearing, the Magistrate Judge recommended in October 2010 that the motion be denied. On December 15, 2010, the government filed a separate indictment under a new docket number, 2:10-cr-200-DBH. The new indictment charged Thompson with four drug-related offenses, an arson offense,[1] and possession of an illegally short rifle. On May 31, 2011, Thompson pleaded guilty to the arson charge and two of those drug-related charges. (Although there was no plea agreement, the government has not refuted the defense's understanding that at sentencing the remaining charges in 10-200 as well as the felon-in-possession charge in 10-74 will be dismissed.[2]) I then ordered the preparation of the customary presentence report.

On June 22, 2011, Thompson and his lawyer met with the Probation Officer who was preparing the presentence report. The Probation Officer reported that on June 22 "Thompson provided a written statement in which he apologized for his actions. The defendant indicated that he has begun to examine his past and is working with drug and alcohol, as well as mental

---

[1] Thompson was charged under 18 U.S.C. § 844(i) (maliciously damaging or destroying by fire property used in or affecting interstate commerce), but I will refer to this simply as arson.

[2] See Tr. of Conference of Counsel, Oct. 24, 2012, at 6 (ECF No. 56); Agreed Mot. to Continue in No. 10-74, May 31, 2011, at 1 (No. 2:10-cr-74-DBH, ECF No. 99), and subsequent motions to continue.

health, treatment providers in an attempt to better understand his decision making process." Revised Presentence Report ¶ 10.  There was no objection to this part of the presentence report.  See id. at 20.  On July 19, 2011, Thompson had a psychiatric evaluation at the jail, and the psychiatrist issued a report July 20, 2011, first brought to my attention in connection with this motion to withdraw guilty plea.

On July 20, 2011, the first presentence report issued and it recommended that the defendant be sentenced as a career offender.[3]  After objections by the parties, the revised presentence report issued on September 16, 2011, still making the career offender recommendation.  At a presentence conference on September 30, 2011, lawyer #1 moved that sentencing be delayed until the First Circuit decided the then-pending case of United States v. Hart, on the basis that Hart might affect Thompson's status as a career offender and thus his sentence.  (The Presentence Report calculated a guideline sentencing range of 262 to 327 months as a career offender after giving Thompson credit for accepting responsibility.  If Thompson were not a career offender he would have been facing a guideline sentencing range of 120 to 150 months.[4])  I granted the motion.

On October 26, 2011, lawyer #1 moved to withdraw as counsel at Thompson's request.  After a hearing on November 18, 2011, at which the

---

[3] As is the practice in this District, I did not see the first version of the presentence report, but only the revised version after the parties had an opportunity to object.  That revised version, dated September 16, 2011, says on the first page that the original report was prepared July 20, 2011.  It also reveals that Thompson objected to the original report's treatment of him as a career offender.  See Revised Presentence Report at 20.

[4] Based upon a total offense level of 27 and a criminal history category V.

possibility of a motion to withdraw Thompson's guilty plea was mentioned, the magistrate judge granted the motion to withdraw as counsel and lawyer #2 was appointed.  On March 16, 2012, the First Circuit decided United States v. Hart, 674 F.3d 33 (1st Cir. 2012).  The Hart decision was unfavorable to Thompson's arguments about his career offender status.  On April 11, 2012, lawyer #2 also moved to withdraw.  After a hearing, the magistrate judge granted that motion on April 17, 2012.  Then Thompson's current lawyer, lawyer #3, was appointed. After numerous conferences with his client and the court, extensive review of discovery materials and a number of continuances, on December 11, 2012, he filed this motion to withdraw Thompson's previous guilty plea.  He replied to the government's objection on January 16, 2013, and supplemented the motion to withdraw on March 1, 2013.   He also requested an evidentiary hearing.  I conducted oral argument on April 22, 2013.  Thompson was present at the argument, as were some of his family members.

## ANALYSIS

### I.    Entitlement to evidentiary hearing.

The First Circuit recently considered the availability of an evidentiary hearing in the context of plea withdrawal motions:

> In connection with an attempted plea retraction, a district court is required to grant a motion for an evidentiary hearing only if, at a bare minimum, "the defendant alleges facts which, if taken as true, would entitle him to relief."   No evidentiary hearing is needed if the defendant's allegations "are contradicted by the record or are inherently incredible and to the extent that they are merely conclusions rather than statements of fact."

United States v. Chambers, 710 F.3d 23, 30 (1st Cir. 2013) (quoting United States v. Santiago Miranda, 654 F.3d 130, 136, 137 (1st Cir. 2011)); see also United States v. Pulido, 566 F.3d 52, 57 (1st Cir. 2009).  As I set forth below, Thompson's factual allegations here are either contradicted by the record or do not entitle him to relief.  I therefore deny his motion for an evidentiary hearing.

## II.   Merits of motion to withdraw guilty plea.

Under Rule 11, a defendant can withdraw a guilty plea before sentencing if he "can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  According to the First Circuit:

> In appraising such a motion, a court ordinarily should begin by considering whether the plea, when entered, was voluntary, intelligent, and informed.  From that starting point, the inquiry customarily should expand to factors such as the strength of the reasons proffered by the defendant as a basis for withdrawing his plea, the timing of the motion, and the force of any assertion of legal innocence.  "If the combined weight of these factors tilts in the defendant's favor," then the court should consider "the quantum of prejudice, if any, that will inure to the government" should the motion be granted.

United States v. Gates, 709 F.3d 58, 68-69 (1st Cir. 2013) (citations omitted); see also Pulido, 566 F.3d at 57; United States v. Padilla-Galarza, 351 F.3d 594, 597 (1st Cir. 2003).  I will consider all the Gates factors.

### A.   Voluntary, intelligent, and informed guilty plea.

The First Circuit has explained that "the formalities imposed by Rule 11 . . . are intended to assure that the defendant understands the charge and the consequences of the plea," Padilla-Galarza, 351 F.3d at 597 (citation omitted), and that the Rule 11 plea colloquy is "designed to confirm a knowing, voluntary, and intelligent plea," United States v. Cheal, 389 F.3d 35, 44 (1st

Cir. 2004).   Thompson does not contend that there was any deficiency in his Rule 11 hearing.   I have reviewed the transcript of his plea hearing and find none.   It followed Rule 11 meticulously, and Thompson's answers to my questions gave no reason to doubt the effectiveness of his guilty plea.   Here are some excerpts:

> [COURT]: Have you recently been seeing any doctor or psychiatrist?
> [THOMPSON]: No, sir.
> [COURT]: Are you currently taking any medicines?
> [THOMPSON]: No, sir.
> [COURT]: Have you used any drug or alcohol in the last 24 hours?
> [THOMPSON]: No, sir.
> [COURT]: Do you feel you understand what's happening in these proceedings?
> [THOMPSON]: Yes, sir.
> [COURT]: Has your lawyer explained to you the consequences that may flow from these proceedings?
> [THOMPSON]: Yes, sir.
> . . . .
> [COURT]:   . . . . [H]ave you pleaded guilty to Counts 1, 3, and 5 because you actually committed those three crimes?
> [THOMPSON]: Yes, sir.
> . . . .
> [COURT]: Did you have enough time to discuss the charges with your lawyer?
> [THOMPSON]: Yes, I did.
> [COURT]: Did your lawyer explain to you the elements and nature of the charged offenses as well as the penalties that can be imposed?
> [THOMPSON]: Yes, he did.

Rule 11 Hr'g Tr. at 2:25-3:14, 4:23-5:1, 5:9-15 (ECF No. 50).   I then summarized the three charges in plainer language than that of the Indictment and asked:

> [COURT]: Do you understand these three charges?
>
> [THOMPSON]: Yes, sir.

Id. at 6:15-16.  I then described the penalties as a minimum of 10 years and as much as life on the drug distribution charges and 5 to 20 years on the arson charge and asked:

> [COURT]: Do you understand those penalties, Mr. Thompson?
>
> [THOMPSON]: Yes.

Id. at 9:11-13.  There was also discussion about the finality of the guilty plea.  I told the defendant that if I accepted his guilty plea,

> I will proceed to enter a judgment of guilty and I will sentence you on the basis of your guilty plea and if all of that happens, you'll have virtually no right of appeal from your conviction; do you understand?

Id. at 11:1-5.  At that point, the transcript shows that there was discussion off the record between Thompson and his lawyer, and the lawyer then said to me:

> There is no waiver of appeal, Your Honor, since there's no agreement.

Id. at 11:8-9.  I responded: "I'm talking about the conviction."  Id. at 11:10.  There was further off-the-record discussion between Thompson and his lawyer.  Then Thompson answered, "Yes, sir."  Id. at 11:13.  Concerned about any confusion, I said:

> [COURT]: Let's just be clear on that.  What Mr. Billings is referring to, I'm going to talk to you in a while that you'll have the right to appeal your sentence, you won't have the right to appeal your conviction; do you understand?
>
> [THOMPSON]: Yes, sir.

<u>Id</u>. at 11:14-19.  I also made certain that Thompson knew that by pleading

guilty there would be no trial:

> [COURT]: If I accept your guilty plea, you'll have
> given up your right to a trial and all the other rights I
> just described to you and there will be no trial of any
> kind on these charges; do you understand?
> [THOMPSON]: Yes, sir.

<u>Id</u>. at 10:20-25.  I then said that I would be asking Thompson questions about

his conduct that gave rise to the charges and

> [COURT]: . . . . You must answer those questions
> truthfully. I'm going to take your answers as true and
> act accordingly; do you understand?
> [THOMPSON]: Yes, sir.

<u>Id</u>. at 11:24-12:2.  Then I turned to the written prosecution version.  With

respect to the first drug conspiracy it said:

> Specifically, the evidence would show that Defendant
> was a crack cocaine dealer who regularly obtained
> distributable amounts of cocaine base from, among others,
> Shareef Nash of Buxton, Maine.  The evidence would
> further show that during this particular year, [Kristin]
> Coolidge was the live-in girlfriend of [Defendant] who
> regularly sold crack cocaine to several customers for him.
> Some of Coolidge's drug trafficking occurred while
> Defendant was incarcerated.  During the periods when
> Defendant was incarcerated, he would arrange for Coolidge
> to receive the illegal drugs from his sources in Maine and
> Massachusetts.
>     The evidence would include testimony of several
> cooperating witnesses and audio recordings of
> conversations between Defendant and Coolidge, as well as
> between Defendant and others, in which they regularly
> discussed the details of Defendant's drug business while he
> was incarcerated.  Specifically, Defendant[5] can be heard
> communicating with Thompson regarding her cocaine base

---

[5] Clearly this is an error and should name Coolidge.  "Defendant" cannot communicate with
"Thompson" because they are one and the same.  Neither the lawyers nor Thompson nor I
noticed the error at the Rule 11 hearing, it was not raised in this motion, and I noticed it only
in preparing this opinion.  Obviously everyone understood what was intended.

possession and distribution. During these calls, Defendant[6] can be heard reporting to Thompson the activities she has performed for the benefit of his drug trafficking business, such as distributing drugs and collecting debts, and traveling to Fitchburg, Massachusetts for the purpose of obtaining more crack cocaine.

Prosecution Version at 1-2 (ECF No. 23). With respect to the arson charge it stated:

> At approximately 12:46am on the morning of November 24, 2009, a fire was reported at the Academy Street rental apartment of Coolidge in Auburn, Maine. Defendant and Coolidge previously resided together at the apartment before his incarceration. At the time of the fire, Defendant was subject to a protection from abuse order, issued by the Maine District Court in Lewiston, Maine on behalf of Coolidge, which prohibited him from having direct or indirect contact with her. An investigation of the fire by the Auburn Police Department (APD) and the Maine State Fire Marshal's Office revealed that, in violation of the protection order, Defendant contacted Coolidge via telephone numerous times throughout the day and night of November 23, 2009 in an effort to get her to meet him at the Academy Street residence. When Coolidge refused, Defendant purchased a gasoline can and gasoline at a local convenience store and obtained a ride to the Academy Street apartment. Defendant then entered the apartment without permission from Coolidge and poured gasoline in all of the rooms of the apartment, except those which belonged to Coolidge's two minor children. Defendant then lit the gasoline on fire and burned the apartment down. Collateral damage was also done to adjacent apartments in the building.

Id. at 2-3. With respect to the second drug conspiracy it stated:

> Specifically, the evidence would show that Defendant was a crack cocaine dealer who became incarcerated on November 24, 2009. The evidence would further show [that during] his incarceration, Lambert, Mercier and others regularly sold crack cocaine to several customers for Defendant. While incarcerated, Defendant would arrange for Lambert and Mercier to receive the illegal drugs from his sources in Massachusetts.

---

[6] See note 5 supra.

The evidence would include testimony of several cooperating witnesses and audio recordings of conversations between Defendant and his co-conspirators, in which they regularly discussed the details of Defendant's drug business while he was incarcerated. Specifically, Defendant can be heard communicating with his co-conspirators regarding their cocaine base possession and distribution. During these calls, the co-conspirators can be heard reporting the drug trafficking activities performed for the benefit of Defendant's drug trafficking business, such as distributing drugs and collecting debts, and traveling to Massachusetts for the purpose of obtaining more crack cocaine.

Id. at 3-4.  At the Rule 11 hearing, after questioning the lawyers about the written prosecution version, I asked Thompson:

> [COURT]: Mr. Thompson, have you read the prosecution version and discussed it with your lawyer?
> [THOMPSON]: Yes, I have.
> [COURT]: Is there anything at all in that document that you disagree with?
> [THOMPSON]: No, sir.
> [COURT]: Is the information given me there true to your own personal knowledge?
> [THOMPSON]: Yes, sir.

Rule 11 Hr'g Tr. at 13:1-6.  I also dealt with voluntariness:

> [COURT]: . . . . Mr. Thompson, has anybody threatened you or tried to force you in any[ ]way to plead guilty?
> [THOMPSON]: No, sir.

Id. at 13:16-18.  And later:

> [COURT]: Has anyone made any promise to you to get you to plead guilty?
> [THOMPSON]: No.

Id. at 15:11-13.  Near the end of the hearing, I made findings:

> [COURT]: Mr. Thompson, I've observed you, your demeanor and attitude throughout these proceedings and find that you're not under the influence of any substance that might impair your judgment. . . . I find

10

> that you've not been coerced, but that you have
> voluntarily and knowingly pleaded guilty to Counts 1,
> 3 and 5.

Id. at 16:4-18.

It is incontestable that, standing alone, the transcript of the May 31, 2011 guilty plea gives absolutely no reason to doubt that Thompson's plea was anything other than voluntary, intelligent, and informed.

I proceed therefore to the other Gates factors ("factors such as the strength of the reasons proffered by the defendant as a basis for withdrawing his plea, the timing of the motion, . . . the force of any assertion of legal innocence [and, 'i]f the combined weight of these factors tilts in the defendant's favor' . . . 'the quantum of prejudice, if any, that will inure to the government' should the motion be granted").  Gates, 709 F.3d at 69 (citations omitted).

### B.   Strength of the reasons proffered as a basis for withdrawing the plea.

Thompson says that his plea was not voluntary, intelligent and informed because (1) he was not given "the opportunity prior to his plea to review the bulk of the discovery allegedly supporting the charges against him," Def.'s Mot. to Withdraw Guilty Plea at 5 (ECF No. 57); (2) he was "led [to plead guilty] by [his] counsel at the time who told [him] to just say 'yes' and nothing more," Thompson Aff. ¶ 2 (ECF No. 66-2), and was "coached before stepping in front of the court," id. ¶ 7; (3) he was not given a "full explanation" of the nature of his charges and was "led . . . to believe [he] would receive a minimum sentence of 10 years," id. ¶ 8; and (4) "his ongoing mental health condition (PTSD, ADHD, Depression) and a lack of medication at the time of his plea contributed to his

decision to take a plea," Supplement to Def.'s Mot. to Withdraw Guilty Plea at 1 (ECF No. 64).

I will deal with each of these assertions.

### i. Thompson's lack of opportunity to review personally the bulk of the discovery.

Thompson contends that "[t]he lack of opportunity to review the discovery in his cases prior to entering his guilty pleas denied [Thompson] an opportunity to make a knowing and voluntary plea" and that he ultimately "plead[ed] guilty out of frustration." Def.'s Mot. to Withdraw at 4. Specifically, the motion states that before his plea Thompson was unable to hear any of the recorded calls and that he did not have access to transcripts of them; that although lawyer #1 discussed with him the government's call summaries including certain materials in quotation marks that Thompson said were not his words, Thompson was not given a copy of the summaries;[7] that Thompson did not see written materials supporting the conspiracy charges; and that lawyer #1 promised Thompson copies of witnesses' grand jury testimony before he pleaded, but failed to provide them until after the plea. Id. at 3-4.

I reject the argument that a defendant cannot enter a binding guilty plea unless previously he personally has seen all the discovery that he asks to see. There is no general constitutional right to discovery of the evidence supporting the prosecution. Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Fed. R.

---

[7] After Thompson's third lawyer was appointed in November 2011, he learned that the statements were placed in quotation marks not to signify that they were Thompson's language but to signify that they were a government investigator's interpretation of what Thompson had said—for example, when code words were allegedly used for drugs.

Crim. P. 16 does impose discovery obligations on the government to disclose certain information to the defense, but Thompson does not assert either that the government failed to provide his lawyer with the discovery materials or that his lawyer failed to review discovery, only that Thompson *personally* was not given the opportunity to review the materials. Thompson was not representing himself, such that he needed to assess on his own what evidence was admissible and how persuasive it was. Courts appoint lawyers for defendants in criminal cases so that the lawyers can do the legwork in preparing for trial and give sound advice about whether a defendant should go to trial or plead guilty. In United States v. Faulkner, 2011 WL 3962513, at *4 (N.D. Tex. Sept. 8, 2011), the trial judge denied a continuance of trial to a defendant who wanted "to review all of the data himself and discuss this evidence with his attorney." The court stated:

> Faulkner cites no authority for his argument that, to be ensured effective assistance of counsel, a defendant must be able to *personally* review all of the relevant discovery before trial. . . . Faulkner's personal review of the disclosed digital data prior to trial is not constitutionally required or otherwise legally mandated where, as here, Faulkner is represented by counsel who has had the ability to review the discovery before trial.[8]

---

[8] Analogously, prisoners represented by lawyers do not have the same constitutional right to legal materials in libraries as do those who are proceeding pro se. See Bounds v. Smith, 430 U.S. 817, 828 (1977) ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law." (emphasis added)); Degrate v. Godwin, 84 F.3d 768, 769 (5th Cir. 1996) ("Guided by Bounds, many federal circuit courts have held that a prisoner who knowingly and voluntarily waives appointed representation by counsel in a criminal proceeding is not entitled to access to a law library." (citing cases)); Williams v. Leeke, 584 F.2d 1336, 1339 (4th Cir. 1978) ("Under Bounds, the state is duty bound to assure prisoners some form of meaningful access to the courts. But states remain free to satisfy that duty in a variety of ways.").

Id.  I agree.[9]

Thompson was free to refuse to plead guilty, but his personal lack of access to discovery materials does not taint the plea that he tendered and that I accepted.  Nothing in Rule 11's lengthy list of topics about which a judge must question a defendant includes reference to discovery materials.  I am aware of no case holding that the Constitution requires that a defendant represented by a lawyer must personally see all the discovery that the government discloses to defense counsel or even the discovery that he asked to see.  Rule 11 requires the judge to determine whether there is a factual basis for a guilty plea.  That occurred here when Thompson agreed that the government's version of the offense contained nothing that he disagreed with, and that the government's version was true to Thompson's own personal knowledge.  Rule 11 Hr'g Tr. at 13:1-6.  To allow a defendant to withdraw his guilty plea after completely admitting the truth of his criminal conduct— because he says later that he did not previously see all the discovery he wanted to see—would amount to a virtually unlimited license to back away from guilty pleas.[10]  Indeed, Padilla-Galarza denied a defendant's motion to withdraw his

---

[9] Other courts also agree.  See, e.g., People v. Krueger, 296 P.3d 294, 300 (Colo. App. 2012) ("In the few cases in which the issue has arisen, most courts have held that '[t]rial counsel's decision whether to provide his client with discovery materials constitutes a matter of trial strategy and judgment that ultimately lies within counsel's discretion.'" (citation omitted)); People v. Savage, 838 N.E.2d 247, 254 (Ill. App. 2005) (same); People v. Davison, 686 N.E.2d 1231, 1235-36 (Ill. App. 1997) (same, elaborating upon the policy reasons).

[10] If Thompson had complained to me at his Rule 11 hearing that he could not plead guilty because there were still materials that he wanted to review with counsel, I would not and could not have forced him to go forward with the plea.  But Thompson made no such complaint and instead answered all my questions consistently with his plea being voluntary, intelligent, and informed, and based upon factual guilt.  The purpose of the Rule 11 questions is to determine if there are any problems with the plea.  Thompson's answers thwarted any conclusion that

*(continued next page)*

guilty plea on allegations very similar to Thompson's. There, the defendant sought to withdraw his plea on the grounds that his lawyer had kept from him an "overwhelming amount of exculpatory evidence," and that he "had only cursorily reviewed the [plea] agreement and been told by [his attorney] that he should trust her, that she had written replies for him to make to the court, and that she had misled him" about the penalties he faced. 351 F.3d at 596-97. The First Circuit nevertheless upheld the district court's denial of the motion to withdraw the guilty plea.

I realize that the Supreme Court decisions in <u>Lafler v. Cooper</u>, 132 S. Ct. 1376 (2012), and <u>Missouri v. Frye</u>, 132 S. Ct. 1399 (2012), recognize that trials are no longer (if ever they were) the norm in the federal criminal justice system and that the primary issue is what kind of plea bargain a defendant can obtain. But Thompson has not explained how his personal review of these discovery materials would have led to a better plea bargain[11] (let alone acquittal at trial).

### ii. Thompson's lawyer told him to say yes and nothing more at the Rule 11 hearing.

If this is an argument that Thompson was under compulsion at the Rule 11 hearing, it is belied by his unqualified statement at the Rule 11 colloquy that he was not coerced into pleading guilty. <u>See</u> Rule 11 Hr'g Tr. at 13:16-18

---

there was a problem. Moreover, a defendant might well determine intelligently that he wants to plead guilty based upon his personal knowledge of what he did, without needing to see all the government's discovery. Here, for example, Thompson was a participant in the phone conversations at the jail that apparently furnish the main evidence against him.

[11] Thompson has no written plea agreement, but he has an uncontested expectation that the government will dismiss the other charges against him at sentencing.

("[COURT]: Mr. Thompson, has anybody threatened you or tried to force you in any[ ]way to plead guilty?  [THOMPSON]: No, sir.").

Thompson claims that his lawyer "coached" him for the Rule 11 proceeding and led him to plead guilty.  So far as coaching is concerned, like other judges I intentionally post on the court's website the questions that I will ask at a Rule 11 hearing precisely so that a lawyer can review them with a defendant before a hearing and explain them to the defendant so that the defendant will understand the significance of his answers at a guilty plea proceeding.  There is nothing improper in a lawyer advising a defendant how to respond if he wants a successful guilty plea.  And so far as leading a defendant to plead guilty is concerned, it is a lawyer's professional responsibility to assess the strengths and weaknesses of a case and advise a defendant accordingly.  Obviously the final decision is the defendant's, but there is nothing wrong in "coaching" or "leading" a defendant in a noncoercive manner to make truthful statements.  See, e.g., Torres-Cuesta v. United States, 2010 WL 3928588, at *3 (E.D.N.Y. 2010) ("Petitioner has not cited, and this Court has not found, any case law setting aside a plea based on a bare allegation of improper coaching."); Padilla-Galarza, 351 F.3d at 598 ("Padilla's current claim that he did not carefully review the written document and that his counsel coached him as to the responses is not by itself enough to show that the plea was uninformed.").  And Thompson's extensive criminal history recounted in the presentence report demonstrates that he is no novice to the criminal justice system.

### iii.   Thompson was not given a full explanation of his charges and was told that he would receive a ten-year sentence.

Rule 11 has specific requirements designed to ensure that a defendant understands the charges to which he is pleading guilty as well as the maximum penalties that can be imposed.  I complied with those requirements during Thompson's guilty plea and, as a result, Thompson's assertions on these two topics are severely undercut by his answers at the Rule 11 colloquy. At the hearing, I questioned Thompson whether he had discussed his charged offenses with his lawyer:

> [COURT]: Did you have enough time to discuss the charges with your lawyer?
> [THOMPSON]: Yes, I did.
> [COURT]: Did your lawyer explain to you the elements and nature of the charged offenses as well as the penalties that can be imposed?
> [THOMPSON]: Yes, he did.

Rule 11 Hr'g Tr. at 5:9-15.  I also summarized for Thompson the three charges to which he was pleading and asked if he understood the three charges and he said that he did.  Id. at 6:15-16.  Then I told him the sentencing ranges for those three offenses (ten years to life on the two drug charges; five years to twenty years on the arson charge), and he said that he understood the penalties.  Id. at 9:11-13.  After explaining the range of penalties he was confronting and his right to a trial and related rights, I inquired, "In light of all that I've just explained to you, do you still choose to plead guilty to Counts 1, 3 and 5 of the indictment?"  Thompson replied "Yes, sir."  Id. at 12:3-6.

Thompson says now that lawyer #1 told him that he would get a sentence of ten years.  Thompson Aff. ¶ 8.  But the Rule 11 questions are

designed to flush out any such promises. Thus, at the end of the colloquy I asked Thompson whether he had received any promises as to his sentence:

> [COURT]: Has anyone made any promise to you to get you to plead guilty?
> [THOMPSON]: No.
> [COURT]: Has anyone made any promise to you as to what kind of sentence I'll impose?
> [THOMPSON]: No.
> [COURT]: Has anyone made any promise to you as to what the prosecutor's sentencing recommendation is going to be?
> [THOMPSON]: No.
> [COURT]: I ask you finally then, do you still want to plead guilty to Counts 1, 3 and 5 of the indictment?
> [THOMPSON]: Yes, sir.

Rule 11 Hr'g Tr. at 15:11-24. There is simply no basis to credit the assertion that Thompson did not receive a full explanation of the charges or was assured that he would receive a 10-year sentence. If courts are to disregard what a defendant says at the Rule 11 hearing about his understanding and allow statements of what a defense lawyer predicted to upset a guilty plea later, a huge number of guilty pleas will be vulnerable.

Thompson's motion in effect requires me to believe that he was misleading me at the Rule 11 hearing, but now is truthfully revealing that he was only a puppet for lawyer #1. That bears all the marks of a "later version[ ] prompted by second thoughts," viewed charily by the First Circuit in Padilla-Galarza: "Ordinarily, a defendant is stuck with the representations that he himself makes in open court at the time of the plea. They are more likely to be reliable than later versions prompted by second thoughts, and guilty pleas— often in the defendant's interest—could hardly be managed any other way."

351 F.3d at 598.   Thompson has failed to establish a good reason for disregarding his Rule 11 answers.   See Pulido, 566 F.3d at 59 ("[W]e have typically disregarded representations at a plea colloquy 'only when the allegations were highly specific and *usually accompanied by some independent corroboration.*'" (citing United States v. Butt, 731 F.2d 75, 80 n.5 (1st Cir. 1984) (emphasis added))).

### iv.   Thompson's ongoing mental health conditions and lack of medication.

Thompson states in his recent affidavit that he "was not . . . under the power of free choice, free from compulsion d[ue] to [his] post-traumatic stress disorder (PTSD) and bi-polar disorder" and that his "state of mind [was] not in [his] body" during the plea colloquy.   Thompson Aff. ¶ 2.   This version of events finds no support in the transcript of the hearing itself:

> [COURT]: Have you recently been seeing any doctor or psychiatrist?
> [THOMPSON]: No, sir.
> [COURT]: Are you currently taking any medicines?
> [THOMPSON]: No, sir.
> . . . .
> [COURT]: Do you feel you understand what's happening in these proceedings?
> [THOMPSON]: Yes, sir.
> . . . .
> [COURT]: Mr. Thompson, I've observed you, your demeanor and attitude throughout these proceedings and find that you're not under the influence of any substance that might impair your judgment. . . . I find that you've not been coerced, but that you have voluntarily and knowingly pleaded guilty to Counts 1, 3, and 5.

Rule 11 Hr'g Tr. at 2:25-3:5, 3:9-11, 16:4-18.

To support his argument that he was not able to make a voluntary decision at his guilty plea hearing, Thompson has submitted a report of psychiatric consultation dated July 20, 2011.  <u>See</u> Ex. 1 to Supplement to Def.'s Mot. to Withdraw Guilty Plea at 2.  But that report provides no basis for determining Thompson's ability to make intelligent, informed and voluntary decisions on May 31, 2011.  Moreover, the report does not support Thompson's position.  It does recount the history of stressors in his life that Thompson recounted to the examiner, it gives an "Impression: Diagnosis:" of post-traumatic stress disorder and polysubstance dependence, and it recommends clonidine at bedtime.[12]   But under the heading "Mental Status Exam," it reports of Thompson:

> Seated, calm, cooperative, polite.  Thoughts are goal directed, sequential, on topic.  No psychotic symptoms.  No thoughts of suicide, self-harm, homicide or harm towards other.  Mood is described as "I'm on guard all the time." Affect tense, constricted in range.  Insight adequate. Judgment adequate.

<u>Id</u>.  That is not a description of someone who is not competent to enter a voluntary guilty plea.  I conclude that Thompson's allegations regarding his mental health are contradicted by the Rule 11 hearing record, they lack specificity, and they are not independently corroborated.

---

[12] The presentence report, first prepared July 20, 2011 (the Probation Officer interviewed Thompson on June 22, 2011), and revised September 16, 2011, states: "Thompson reports he was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a child.  The defendant states he did attend appointments with a psychiatrist as a child to receive medication for this condition but could not recall any specific treatment provider.  Thompson has no other mental or emotional health condition and is not presently prescribed medication for a mental or emotional health condition."  ¶ 72.

Thus, in summary, under the <u>Gates</u> factor of strength of the reasons proffered by the defendant as a basis for withdrawing his plea, Thompson's asserted grounds either merit little credence or fail to provide a viable basis for withdrawal.

I turn, therefore, to the next <u>Gates</u> factor, timing of the motion.

**C.   Timing.**

Thompson pleaded guilty on May 31, 2011.  He learned of his likely career offender status and enhanced sentence when the presentence report issued on July 20, 2011 (or soon thereafter).  At the September 30, 2011 presentence conference, I postponed Thompson's sentencing at lawyer #1's request to await the First Circuit's decision in <u>Hart</u>, because <u>Hart</u> might be helpful to Thompson's challenges to career offender status.  (Lawyer #1 also said at that conference that Thompson's family had engaged a lawyer in Massachusetts to see if one of Thompson's Massachusetts state convictions that affected career offender status could be overturned.)  While waiting for the decision in <u>Hart</u>, lawyer #1 withdrew at Thompson's request and was replaced by a second lawyer.  The potential effort to withdraw Thompson's guilty plea was mentioned at the hearing on lawyer #1's motion to withdraw as counsel. Lawyer #2 withdrew as counsel soon after <u>Hart</u> was decided on March 16, 2012.  The court appointed Thompson's third and current lawyer on April 18, 2012.  Thompson did not file his motion to withdraw until December 2012, eight months thereafter and eighteen months after his guilty plea.

I mean no criticism of lawyer #3 for the delay.  Upon his appointment, there was voluminous discovery that he needed to review in order to advise Thompson on whether to go forward to sentencing or move to withdraw his guilty plea, and Thompson's previous history with lawyers in this case demonstrates that he can be a challenging client.  Moreover, the stakes were high.  If the motion were denied, Thompson's 3-level Guideline reduction for acceptance of responsibility would be in jeopardy.  If it were granted and Thompson proceeded to trial and was convicted, the 3-level reduction would again be unlikely.

But the time elapsed following the May 31, 2011, guilty plea—even the time to the first mention of a possible motion to withdraw plea at the November 2011 hearing on lawyer #1's motion to withdraw as counsel—significantly exceeds the amount of time recognized as legitimate.  See, e.g., United States v. Isom, 85 F.3d 831, 838-39 (1st Cir. 1996) ("[W]e have viewed unfavorably motions to withdraw a plea made six months following the guilty plea, seven months later, three weeks later, or thirteen days later.  Clearly, [defendant's] two-month delay in making his request falls well within this range." (citations omitted)).  As the First Circuit said in Isom: "Given the totality of the circumstances that pertain here, [the defendant's] lassitude serves to cast considerable doubt upon the legitimacy of his professed reason for seeking to change course."  Id. at 839 (quoting United States v. González-Vázquez, 34 F.3d 19, 23 (1st Cir. 1994)).

The next Gates factor is the force of any assertion of legal innocence.

22

### D.    Thompson's assertion of legal innocence.

Thompson has never claimed either factual or legal innocence—not at the Rule 11 hearing, not to the Probation Officer preparing the Presentence Report, and not in any of his subsequent filings on this motion.[13]    At the Rule 11 hearing, Thompson admitted that he actually committed the crimes in question:

> [COURT]: First of all, sir, have you pleaded guilty to Counts 1, 3, and 5 because you actually committed those three crimes?
> [THOMPSON]: Yes, sir.

Rule 11 Hr'g Tr. at 4:23-5:1.   He has never contradicted that assertion.   He provided the Probation Officer preparing the presentence report with "a written statement in which he apologized for his actions."   Presentence Report ¶ 10. Thompson's motion to withdraw and subsequent filings do not even remotely insinuate that he is innocent.   Although that failure is not alone fatal to the motion to withdraw, it certainly is an important factor.   That remains the case even after Frye and Lafler.

### E.    Prejudice to government.

Because the above factors do not tilt the balance in Thompson's favor, according to Gates I need not decide the issue of prejudice to the government should the motion be granted.   ("If the combined weight of these factors tilts in the defendant's favor,' then the court should consider 'the quantum of prejudice, if any, that will inure to the government' should the motion be

---

[13] Even some defendants protesting their innocence have nevertheless been denied withdrawal of a guilty plea.   See, e.g., Gates, 709 F.3d at 69-70; Isom, 85 F.3d at 837, 839.

granted." <u>Gates</u>, 709 F.3d at 69 (citation omitted).)  I do note, however, that during the time since Thompson's guilty plea, many of the cooperating co-defendants have been prosecuted and sentenced and it may therefore be more difficult to obtain their testimony.  <u>See</u> Government's Objection to Def.'s Mot. to Withdraw Guilty Plea at 9 (ECF No. 58).[14]

### III.    Thompson himself.

Thompson's lawyer told me several times that Thompson wanted to address me directly and, despite the fact that Thompson has a lawyer and has no right to hybrid representation, he urged me to let him do so.  As a result, and because lawyer #3 has devoted so much of his time and energy to presenting Thompson's claims, at the end of the oral argument on this motion I gave Thompson that opportunity.  Thompson complained about his previous lawyers and his current lawyer[15] and his medical treatment at the jail where he is housed.  He also told me that his "attention span is gone," that he cannot focus, that he did not understand much that had been said during the oral argument, and that he was "in a corner."  I express no judgment on what effect, if any, such claims might have at sentencing.  What is clear is that they have no impact on my consideration of Thompson's motion to withdraw his guilty plea.  The proceedings on April 22, 2013, were not an evidentiary hearing, and Thompson had no right even to be present for what was a legal argument.  See

---

[14] Some of the co-defendants are listed in Thompson's presentence report.  Count One states that he conspired with Shareef Nash.  Shareef Nash and all but two members of that conspiracy have already been sentenced.  <u>See</u> <u>United States v. Nash</u>, Docket No. 10-136; <u>United States v. Worthy</u>, Docket No. 12-135.

[15] "I'm tired of constantly arguing with this man and putting him in a situation because I don't understand what's going on."

Fed. R. Crim. P. 43(b)(3).   It is not surprising that Thompson would not understand much that was said in the courtroom during the argument on the motion; few laypeople would.   Thompson's lack of focus is also not a concern, since there was no need for him at the oral argument to assist his lawyer, to testify, or to comment to his lawyer about the testimony of other witnesses. Finally, his feeling that he is "in a corner" is totally understandable and realistic given the sentencing range that he is confronting.   But it does not bear upon the merits of his motion to withdraw his guilty plea.

CONCLUSION

Weighing all of the relevant considerations in this case, none of which favor Thompson, I **DENY** Thompson's Motion to Withdraw Guilty Plea.   I also conclude that his assertions do not justify an evidentiary hearing.

The Clerk shall schedule the matter for sentencing.

**SO ORDERED.**

**DATED THIS 29TH DAY OF APRIL, 2013**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**